# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADAN SANCHEZ SANCHEZ, <br><br> Plaintiff, <br><br> v. <br><br> ULTIMO, LLC d/b/a MALBEC RESTAURANT, *et al.*, <br><br> Defendants. | Case No. 1:19-cv-03188-RMM |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Adan Sanchez Sanchez ("Mr. Sanchez" or "Plaintiff") has sued his former employer, Ultimo, LLC d/b/a Malbec Restaurant ("Malbec") and owner Felix Nelson Ayala, Sr. ("Mr. Ayala") (collectively "Defendants"), for unpaid overtime, alleging violations of the Fair Labor Standards Act ("FLSA"), the D.C. Minimum Wage Act ("DCMWA") and the D.C. Wage Payment and Collection Law ("DCWPCL"). *See generally* Compl., ECF No. 1. Mr. Sanchez contends that Defendants failed to pay him overtime wages during his tenure at Malbec. The Court granted-in-part and denied-in-part Mr. Sanchez's Motion for Summary Judgment and Defendants' Cross-Motion for Summary Judgment. *See* Mem. Op., ECF No. 25. On October 23 and 24, 2023, this Court held a bench trial. Following the bench trial, and as instructed by the Court, the parties submitted their proposed Findings of Fact and Conclusions of Law. This Court now makes its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1). Upon consideration of the parties' submissions, witness testimony, evidence presented at trial, and relevant law, the Court finds that Mr. Sanchez did not qualify as an

exempted executive employee and that he is entitled to unpaid overtime wages because he worked more than forty hours per week. The Court enters judgment in favor of Mr. Sanchez.

## BACKGROUND

Mr. Sanchez worked at Malbec, an Argentinian steakhouse[1] located in Washington, D.C., from December 15, 2015 through August 30, 2019. *See* Jt. Pretrial Statement ("JPS"), ECF No. 45 at 2, 4; Mem. Op. at 2. Throughout this time, Mr. Sanchez was the restaurant's "kitchen manager" or "chef." JPS at 4, 4; Mem. Op. at 2. Mr. Ayala was the owner and operator of Malbec. *See* Mem. Op. at 2; Trial Tr. 1, 97:20–23. Carlos Di Laudo ("Mr. Di Laudo") was Malbec's general manager during the relevant time period. *See* JPS at 4; Mem. Op. at 2; Trial Tr. 1, 104:20–22.

Both parties agree that Mr. Sanchez was the principal cook at Malbec during the relevant time period. *See* JPS at 2; Mem. Op. at 2. Although the parties disagree about specific duties Mr. Sanchez performed at Malbec, at the summary judgment stage this Court found that Mr. Sanchez performed the following duties: "identifying and listing items the kitchen required for daily and weekly operations, including inventorying the produce, meats, vegetable, and cleaning products needed; food preparation; directing and supervising the work activities of the kitchen staff; keeping the kitchen clean; and overseeing the cleaning staff." Mem. Op. at 3. Mr. Sanchez was usually the only cook in the kitchen during the lunch service, but during evenings and weekends often one or more individuals were in the kitchen to help him cook and do dishes. *See* Mem. Op. at 3; Trial Tr. 1, 97:3–9.

---

[1] Malbec closed permanently on December 29, 2023 upon the expiration of its lease. *See* Def.'s Facts & Law, ECF No. 48 at 2 n.1.

On October 24, 2019, Mr. Sanchez brought suit in this Court against Defendants Malbec and Mr. Ayala, alleging that, during the course of his employment at Malbec, Defendants denied him overtime compensation in violation of the FLSA, DCMWA, and DCWPCL.  *See* Compl. Specifically, Mr. Sanchez alleged that he worked approximately 70.5 hours per week as a cook at Malbec and received a weekly salary between $700 and $1,100.00.  *See id.* ¶¶ 11–12.  He noted that his job duties did not qualify him for any exemption under the relevant statutes.  *See id.* ¶ 15. Therefore, because Mr. Sanchez worked more than 40 hours per week, he alleged that Defendants failed to pay him one-and-one-half times his rate for hours he worked over forty. *See id.* ¶¶ 14, 16.  He thus argues that he is entitled to overtime wages of $112,102.50, and liquidated damages of $336,307.50, for total damages of $448,410 (excluding attorneys' fees and costs).  Pl.'s Proposed Findings of Fact and Conclusions of Law ("Pl. Mem.") at 46, ECF No. 49.

Defendants deny Mr. Sanchez's assertions and argue that Mr. Sanchez qualified for the executive exemption under both the FLSA and DCMWA by virtue of his role as kitchen manager at Malbec.  They argue that Mr. Sanchez exercised responsibilities of an executive, such as supervising the kitchen staff and managing the inventory.  JPS at 4–5.  They admit that Mr. Sanchez was not paid an overtime rate but contend that he is not entitled to the overtime wages he seeks.  *Id.*

At summary judgment, the Court concluded that (1) Defendants are covered by the FLSA—by virtue of enterprise coverage—from January 1, 2018 through August, 20 2019, because Malbec's gross volume of sales exceeded $500,000 in both years, but neither enterprise nor individual coverage exists for 2016 and 2017; (2) Mr. Sanchez was not paid an overtime premium of one and one-half times his normal salary; and (3) Mr. Ayala is liable as an individual "employer" under the FLSA and DCMWA.  *See* Mem. Op. at 7–15, 21–23.  Having found

genuine and material factual disputes for the following issues, the Court did not grant summary judgment on (1) whether Mr. Sanchez qualified as an exempt executive under the FLSA and DCMWA, (2) whether he was therefore entitled to overtime compensation and/or liquidated damages under the FLSA and/or DCMWA. *See id.* at 15–21, 23.

This Court conducted a two-day bench trial on October 23 and October 24, 2023. Plaintiff testified and also called former coworkers Mr. Di Laudo, Wilfredo Delcid, Ariel Anzora, and Mr. Ayala to testify. Defendants also called Mr. Ayala to testify, in addition to Rafael Gutierrez, and Francisco Castillo Mendez. At the conclusion of the trial, Mr. Sanchez orally moved for judgment, which this Court denied. *See* Dec. 21, 2023 Min. Order.

After considering witness testimony, the evidence presented, and the parties' proposed Findings of Fact and Conclusions of Law, the Court finds that Defendants have not met their burden of proof to establish that Mr. Sanchez qualified as an exempt executive employee and further finds that Mr. Sanchez is entitled to overtime wages in the amount of $112,102.50 plus treble damages and attorney's fees.

## FINDINGS OF FACT

1. Mr. Sanchez previously worked for Mr. Di Laudo at another restaurant, Chimichurri, where he was "in charge of the kitchen." Tr. 1, 143:19–23, 92:15–17 (Sanchez). Mr. Di Laudo then offered Mr. Sanchez employment at Malbec to "be in charge of the kitchen." Tr. 1, 147:14-18 (Sanchez).

2. Mr. Sanchez worked at Malbec from December 15, 2015 to August 30, 2019. The relevant period of employment begins October 24, 2016 and amounts to 150 weeks. Joint Pretrial Statement at 14–15, ECF No. 45; Tr. 2, 112:18–20 (Anzora).

3. Mr. Sanchez was paid a weekly salary of $1,000 between October 24, 2016 and July 5, 2017, and a weekly salary of $1,100 from July 6, 2017 to August 30, 2019. Joint Pretrial

Statement Ex. A, ECF No. 45-2.

4. Mr. Sanchez did not clock in or clock out, nor were there any other records of Mr. Sanchez's hours from the relevant period.  Tr. 1, 68:4–6 (Ayala), 160:17–19 (Sanchez).

5. Mr. Ayala, the owner of Malbec, was responsible for hiring, firing, salary decisions, discipline, and the terms of each employee's employment.  *See* Mem. Op. at 2.  However, Mr. Di Laudo oversaw daily operations and supervised all employees as Malbec's General Manager.  *See* Tr. 1, 43:10–11, 50:13–16 (Ayala); Tr. 2, 9:2–8 (Di Laudo), 62:10–24 (Di Laudo), 91:17–24 (Del Cid).  Mr. Di Laudo supervised Mr. Sanchez in the kitchen and monitored all dishes coming from the kitchen.  Tr. 2, 9:05–08; Tr. 1, 108:2–109:9.  Mr. Di Laudo and Mr. Ayala together set employee schedules, reviewed payroll, interviewed job candidates, and made salary, hiring, and firing decisions.  Tr. 2, 16:13–20 (Di Laudo); Tr. 1, 44:6–10 (Ayala); Tr. 1, 107:13–108:1 (Sanchez).

**HOURS**

6. Malbec was open 55.5 hours a week.  Malbec opened for lunch from 11:30 am to 2:30 pm on Tuesday – Saturday and from 11:00 am to 2:30 pm on Sunday.  Malbec opened for dinner from 5:00 pm to 10:00 pm Sunday – Thursday and from 5:00 pm to 11:00 pm on Friday and Saturday.  *See* Def. Tr. Ex. 1.

7. Mr. Sanchez worked the lunch and dinner shifts Tuesday – Sunday (six days per week) from October 2016 to around April 2019, and thereafter the lunch and dinner shifts Tuesday – Saturday (five days per week).  Tr. 2, 23:10-19 (Di Laudo); Tr. 1, 111:21—112:10 (Sanchez).

8. Mr. Sanchez typically arrived between 10:30 and 11:00 AM for lunch service.  Tr. 1, 111: 3- 4 (Sanchez); Tr. 2, 73:14–74:4 (Di Laudo).  Mr. Sanchez would take a break between lunch service and dinner service.  On average, Mr. Sanchez took an hour and fifteen minute long break.  *See* Tr. 1, 113:6–11 (Sanchez) (testifying his breaks lasted 30

5

to 45 minutes); Tr. 2, 76:1–4 (Di Laudo) (testifying his breaks lasted up to two hours). On Tuesdays through Thursdays, Mr. Sanchez typically left the restaurant around 10:30 PM. *See* Tr. 1, 111: 3–6 (Sanchez). On Fridays and Saturdays, he left around 11:30 PM. *See* Tr.1, 111:7–10 (Sanchez). On Sundays, Mr. Sanchez left around 9:30 PM. *See* Tr.1, 111:13–14 (Sanchez). Mr. Sanchez would work until customers left, sometimes after the restaurant closed. Tr. 90:09–23 (Del Cid).

9. In consideration of the testimony provided from both sides, Mr. Sanchez worked, on average, over 10 and a half hours a day, six days a week—or 64 hours a week—until April 2019. Between April and August 2019, Mr. Sanchez worked, on average, approximately 11 hours a day, five days a week—or 54.5 hours a week.

**DUTIES**

10. Mr. Sanchez was responsible for cooking, identifying and listing items needed in inventory, and cleaning the kitchen. Tr. 2, 56:21–24, 57:1–6 (Di Laudo); Tr. 1, 63–64 (Ayala); Tr. 1 153:21-22 (Sanchez testifying that he "was in charge of the kitchen, not of the employees, but just in charge of cooking"); Tr. 1, 117:17–25 (Sanchez discussing requesting inventory from Di Laudo); Tr. 1, 128–129 (Sanchez discussing cleaning). Mr. Sanchez trained and gave instructions to prep cooks and the dishwasher in kitchen, but they would otherwise work on their own. Tr. 1, 158:22–159:2 (Sanchez); Tr. 2, 137:18–138:1 (Gutierrez); Tr. 131:25–132:5 (Gutierrez); Tr. 2, 159:24–160:5 (Castillo). Mr. Sanchez's principal duty was cooking. Tr. 1, 64:25–65:01 (Ayala); Tr. 2, 90 (Del Cid) (describing how Sanchez spent the entire day cooking).

11. Mr. Sanchez prepared the entire menu, a range of complex dishes and desserts, from scratch. Tr. 1, 116–128 (Sanchez). One such dish, Matambre, took two and a half to three hours to prepare and cook. Tr. 1, 120:7–20 (Sanchez).

12. Mr. Sanchez could have recommended the hiring and firing of back of house employees to Mr. Di Laudo. Tr. 2, 57:22–25, 58:1 (Di Laudo). Other employees made similar

6

recommendations, like busser Wilfredo Del Cid who recommended Rafael Gutierrez for a busser job. Tr. 2, 91:25–92:7 (Del Cid). However, Mr. Di Laudo only consulted with Mr. Ayala when making the decision to hire or fire an employee. Tr. 2, 21:2–18, 22:10–16 (Di Laudo); Tr. 1, 107:11–22 (Sanchez) (testifying that he was not consulted before a back of house employee was fired). Mr. Sanchez never interviewed candidates or was consulted with for a hiring or firing decision. Tr. 1, 107:11–17 (Sanchez).

**OTHER KITCHEN EMPLOYEES**

13. Mr. Sanchez was typically the only employee in the kitchen on Tuesdays, Wednesdays, and Thursdays, and during lunch service. Tr. 2, 46:4–12 (Di Laudo); Tr. 1, 98:14–24 (Sanchez).

14. Mr. Sanchez was otherwise joined in the kitchen by two part-time employees: a dishwasher and a prep cook. Tr. 2, 42–44 (Di Laudo); Tr. 1, 103:11–15 (Sanchez). There was sometimes an additional prep cook in the kitchen. Tr. 1, 133:5–18 (Sanchez); *see* Pl. Exs. 9–10 (indicating from payroll records that more than one prep cook was present in the kitchen during 62 of the 150 weeks, or less than half of the time, at issue).

15. For most of the time period at issue, Francisco Castillo was the dishwasher, Jenny Garcia was the prep cook, and Rafael Gutierrez—a busser—would sometimes work as an additional prep cook. Tr. 1, 49:07–12, 50:10–52:24 (Ayala); Tr. 1, 99:11–13, 101:5–8 (Sanchez); Tr. 2, 51:13–52:07 (Di Laudo); Tr. 2, 99:09, 100:19 (Del Cid); Tr. 2, 128:02–06 (Guiterrez); Tr. 1, 133:5–18 (Sanchez). Other individuals also worked as dishwashers and prep cooks for short periods of time during Mr. Sanchez's employment. *See* Tr. 1, 73:20–74:06 (Ayala); Pl. Exs. 1, 9–10 (payroll records and summary tables).

16. Mr. Castillo only worked the dinner shift, usually arriving after 4:30. Tr. 2, 154:01–24, 158:06–09 (Castillo). Ms. Garcia typically worked the dinner shift on weekends and when Mr. Sanchez was off. *See* Tr. 2, 50:14–23 (Di Laudo); Tr. 2, 99:9–100:2 (Del Cid); Mr. Gutierrez worked part-time and split his hours between bussing and helping in the

kitchen. Tr. 2, 145:16–25 (Gutierrez). Mr. Gutierrez's hours in the kitchen are delineated on his paystubs as "DISHWASHER" or "KITCHEN" and paid at the minimum wage, while his hours as a busser are typically labeled "hourly" and paid below minimum wage. *See, e.g.*, Pl. Ex. 2, 001116–21 (first paystubs showing consistent hours in kitchen role in late 2018); Tr. 2, 135–36 (Gutierrez confirming that he began kitchen work in late 2018); Tr. 2, 144–46 (Gutierrez confirming that paystub hours reflected his duties).

17. Mr. Sanchez would ask Ms. Garcia, or Mr. Gutierrez if he was in the kitchen, to help with preparing ingredients and provide instruction. Tr. 1, 102:19–25, 133:5–18 (Sanchez); Tr. 2, 145:16–25 (Gutierrez). When it was busy Mr. Sanchez would ask Mr. Castillo to help prepare ingredients and ask Ms. Garcia to cook alongside him. Tr. 1, 101:14–19, 102:3–8 (Sanchez). When Mr. Sanchez was not working, on Mondays and later on Sundays and Mondays, Ms. Garcia did all of the prep and cooking on her own or with Mr. Gutierrez's help. Tr. 1, 101:20–24, 110, 112:9–13 (Sanchez); Tr. 2, 50:05–51:03 (Di Laudo).

18. Mr. Castillo, Ms. Garcia, and Mr. Gutierrez (or other temporary dishwashers and prep cooks) rarely worked 80 combined hours a week in the kitchen. Their combined hours equaled or exceeded 80 in only 11 weeks out of the 150 week period at issue. *See* Pl. Ex. 9; Tr. 2, 112:18–23. This amounts to just 7 percent of the time that Mr. Sanchez worked at Malbec. Tr. 2, 112:24–113:1. Notably, this finding does not account for the time that Mr. Sanchez did not work on Sundays and Mondays.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 52, "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). When presenting the findings of fact, "the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial." *Yah Kai World Wide Enterprises, Inc. v. Napper*, 195 F. Supp. 3d 287, 295

(D.D.C. 2016) (quoting *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015)) (internal quotation marks and citations omitted).  Instead, the Court need only "make brief, definite, pertinent findings and conclusions upon the contested matters" in a way that is "sufficient to allow the appellate court to conduct a meaningful review."  *Wise v. United States*, 145 F. Supp. 3d 53, 57 (D.D.C. 2015) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment); *see also Ramirez v. U.S. Immigr. & Customs Enforcement*, 471 F. Supp. 3d 88, 97 (D.D.C. 2020), *judgment entered*, 568 F. Supp. 3d 10 (D.D.C. 2021) ("The Court's findings must be sufficient to indicate the factual basis for the ultimate conclusion.").

Generally, the plaintiff's burden of proof in a civil trial is "by a preponderance of the evidence."  *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 181 (D.D.C. 2012).  The preponderance of the evidence standard requires that "the fact-finder believe that the existence of a fact is more probable than the non-existence of that fact."  *Id.* (quoting *United States v. Smith*, 267 F.3d 1154, 1161 (D.C. Cir. 2001)).  "In the simplest of terms, preponderance of the evidence means more likely than not."  *Ramirez*, 471 F. Supp. 3d at 99 (internal quotations and citations omitted).

## CONCLUSIONS OF LAW

Having made findings of fact, the Court now enters the conclusions of law.  The Court first addresses below Mr. Sanchez's argument that he was not a qualified exempt employee and was therefore entitled to overtime compensation.  The Court will then discuss Mr. Sanchez's claims for unpaid overtime compensation under the FLSA, DCMWA, and DCWPCL and liquidated damages.

## I. Whether Mr. Sanchez Qualified as an Exempt Employee

### A. Legal Standard

The FLSA includes several enumerated exemptions that release employers from paying employees an overtime premium for hours worked over forty hours per week, including a provision that exempts individuals employed in a *bona fide* executive capacity. *See* 29 U.S.C. §§ 207(a), 213(a). The DCMWA contains the same "executive exemption," which is interpreted identically to its FLSA corollary. *Seo v. Oh*, 573 F. Supp. 3d 277, 288 (D.D.C. 2021). Exemptions are affirmative defenses for which the employer bears the burden of proof. *See id.*; *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974). Exemptions also are "narrowly construed against the employer in order to further Congress's goal of affording broad federal government protection." *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 50–51 (D.D.C. 2006) (quoting *Danesh v. Rite Aid Corp.*, 39 F. Supp. 2d 7, 10 (D.D.C. 1999)).

The regulations that implement the FLSA "are the primary source of guidance for determining the scope of exemptions to the FLSA." *Rodriguez v. Adams Rest. Grp.*, 308 F. Supp. 3d 359, 363 (D.D.C. 2018) (quoting *Clements v. Serco*, 530 F. 3d 1224, 1227 (10th Cir. 2008)) (other quotations omitted). 29 C.F.R. § 541.100(a) defines executive employee as an individual:

> (1) [Who is] [c]ompensated on a salary basis . . . at a rate of not less than $684 per week exclusive of board, lodging and other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; *and*
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (emphasis added).

### B. Analysis

#### 1. *Whether Mr. Sanchez Made Not Less Than $684 Per Week*

The parties do not dispute that Mr. Sanchez was paid above the $684 weekly threshold set out in the statute. *See* Mem. Op. at 16. The Court therefore finds this factor satisfied.

#### 2. *Whether Mr. Sanchez's Primary Duty Was Management*

Determining whether an employee's primary duty is management depends upon "all the facts in a particular case." 29 C.F.R. § 541.103; *Harris v. District of Columbia*, 741 F. Supp. 254, 259 (D.D.C. 1990). The term "primary duty" refers to the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700. Neither the title given to the employee nor the amount of time spent on management tasks is dispositive. *Id.* § 541.200; *Jones v. Changsila*, 271 F. Supp. 3d 9, 18 (D.D.C. 2017) ("Significantly, an employee's 'job title alone is insufficient to establish the exempt status of an employee.'" (quoting 29 C.F.R. § 541.2)). DOL regulations define "management" as activities, including but not limited to:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees . . . planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The Court finds that Mr. Sanchez's primary duty was not management. Mr. Sanchez was hired to be "in charge of the kitchen," and trial testimony revealed that his duties did not significantly extend beyond cooking, preparing the menu, handling the food inventory, and

11

cleaning the kitchen.  Tr. 1, 143:19–23, 92:15–17; Tr. 2, 56:21–24, 57:1–6 (Di Laudo); Tr. 1, 6–-64 (Ayala).  Indeed, Mr. Sanchez testified that he was "just in charge of cooking" and "not [in charge] of employees."  Tr. 1 153:21–22.  In addition, Mr. Sanchez neither was in charge of, nor had significant (if any) input in, hiring and firing decisions.  Tr. 2, 21:2–18, 22:10–16 (Di Laudo); Tr. 1, 107:11–22 (Sanchez) (testifying that he was not consulted before a back of house employee was fired).

Trial testimony suggested that there is some ambiguity as to whether Mr. Sanchez occasionally performed some managerial duties, such as occasionally supervising back of the house employees.  But *sometimes* performing managerial duties is not enough to prove that management is a "primary duty."  See *Jones*, 271 F. Supp. 3d at 19 ("[E]ven if [the worker] did perform some managerial functions, the executive employee exemption applies only where the employee's 'primary duty' involves the performance of exempt work.").  It is undisputed that much of Mr. Sanchez's time working in the kitchen was solitary, and he occasionally spent the entire day in the kitchen just cooking.  Tr. 2, 90; Tr. 2, 46:4–12.  That further undermines Malbec's assertion that Mr. Sanchez was primarily a manager, as "courts have found that a chef's 'primary duty' is not management where his duties primarily entail cooking."  *Karropoulos v. Soup du Jour, Ltd.*, 128 F. Supp. 3d 518, 530 (E.D.N.Y. 2015).

Mr. Sanchez's ownership and control over the menu also does not prove that he was an exempt employee.  Job tasks that "involve[] the exercise of discretion and independent judgment *unrelated to management or general business operations* in no way renders" an employee exempt.  *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 52 (D.D.C. 2006).  In addition, although there was trial testimony indicating that Mr. Sanchez had provided instruction and training to kitchen employees, *see* Tr. 1, 158:22– 159:2, being a "leader among [one's] co-workers does not

12

transform" an individual into an exempt employee. *Hunter*, 453 F. Supp. 2d 44, 52 (D.D.C. 2006). And here, there is not enough evidence to demonstrate that one of Mr. Sanchez's *primary* duties was to train, instruct, and supervise kitchen employees; in fact, the kitchen employees usually worked on their own. Tr. 1, 158:22– 159:2. Even if Mr. Sanchez could be characterized as an assistant manager, which this Court does not suggest, "assistant managers generally would not satisfy the primary duty requirement." 29 C.F.R. § 541.700(c).; *see Cheng Chung Liang v. J.C. Broadway Rest., Inc.*, No. 12-cv-1054, 2015 WL 5439178, at *3 (S.D.N.Y. Sept. 15, 2015).

In sum, the trial testimony on this issue did not show that Mr. Sanchez's primary duty was management. Therefore, having failed to meet their burden on this factor, Defendants have failed to show that Mr. Sanchez was an exempt executive employee.[2]

## II. Mr. Sanchez Worked 2,770 Hours of Overtime

"It is a long-standing principle in wage law that where an employer fails to produce records of the employee's hours and wages, the employee can meet [their] burden of proof by 'produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Serrano v. Chicken-Out Inc.*, 209 F. Supp. 3d 179, 187 (D.D.C. 2016) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)) (applying *Anderson* to FLSA and DCMWA claims). "[A] court will give the plaintiff's estimate of damages a strong presumption of validity." *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 8, 13 (D.D.C. 2010) (applying *Anderson* to DCMWA and DCWCPL). Thus, "[t]he fact that the

---

[2] This Court declines to decide whether Mr. Sanchez satisfied the remaining two prongs of the executive exemption test articulated in 29 C.F.R. § 541.100(a), because an employee must satisfy all four prongs to be considered an exempt executive. Specifically, the Court will not address whether Mr. Sanchez customarily and regularly directed the work of two employees, and whether he had hiring and firing authority. Defendants' failure to satisfy the second factor makes it unnecessary for the Court to decide the next two.

employee's evidence is merely an approximation is not a bar to recovery." *Hunter*, 453 F. Supp. 2d at 53 (citing *Anderson*, 328 U.S. at 688). The burden then shifts to the employer to provide contradictory evidence of "the precise amount of work performed" or otherwise negate the inference drawn from the employee's evidence. *Anderson*, 328 U.S. at 687–88.

Defendants did not maintain records of Mr. Sanchez's hours as required by the FLSA. *See* Tr. 1, 68:4–6 (Ayala), 160:17–19 (Sanchez); *see also* JPS at 12. Rather, witnesses for both parties provided testimony outlining when Mr. Sanchez would arrive, how long he would take breaks for, and when he would leave. Taken together, it appears that Mr. Sanchez typically arrived between 10:30 and 11:00 AM, took an hour and fifteen-minute-long afternoon break, and left between 9:30 and 11:30 PM—approximately ten and a half to eleven hours a day. Mr. Sanchez's "conservative estimate" of overtime hours—20 hours per week from October 24, 2016 to April 3, 2019 and 10 hours per week from April 3, 2019 to August 30, 2019—although imprecise, is consistent with the testimony presented. JPS at 14. Thus Mr. Sanchez is entitled to overtime pay for a total of 2,770 hours.

### III. Mr. Sanchez is entitled to $112,102.50 in Unpaid Wages

The FLSA and DCWMA require employers to pay covered employees for any time worked beyond forty hours in a workweek at a rate of one and one-half times their regular hourly rate. 29 U.S.C. § 207(a)(1); D.C. Code § 32-1003(c). Both statutes provide for damages in the amount of the unpaid wages. 29 U.S.C. § 216(b); D.C. Code § 32-1012(b)(1). And, former employees have a standalone right to collect unpaid wages under the DCWPCL. D.C. Code §§ 32-1303(1)–(2). Mr. Sanchez is not eligible for overtime pay under the FLSA for 2016–2017. *See* Mem. Op. at 14–15; 29 U.S.C. §255(a) (establishing two-year statute of limitations). This forecloses some of Mr. Sanchez's FLSA damages, but does not preclude Mr. Sanchez from

pursuing damages for the entire period at issue under the DCWMA and DCWPCL.  *See* Mem. Op. at 15; *see also* JPS at 11 n.2.  Thus the Court will consider whether Mr. Sanchez is eligible for overtime wages for the entire period—October 24, 2016 to August 30, 2019.

The parties agree on the following:

> Plaintiff is entitled to 1.5 times his regular rate for all hours worked over forty each week.  Plaintiff's regular rate is calculated by dividing his total salary by forty. . . . His unpaid wages will then be calculated by multiplying his regular rate of pay by 1.5 to calculate his overtime pay.  Thereafter, his overtime pay will be multiplied by the number of overtime hours he worked during the relevant period.

JPS at 12 (internal citation omitted).  The parties have stipulated the relevant period and weekly salary.  *See* JPS at 15; JPS Ex. B, ECF No. 45-2.  Plaintiff estimates that Mr. Sanchez is owed $112,102.50 in overtime pay.  JPS Ex. A., ECF No. 45-1.  Plaintiff's calculation is consistent with the parties' stipulation and so $112,102.50 shall be awarded pursuant to the FLSA, DCMWA, and DCWPCL.

**IV. Liquidated Damages**

The FLSA, DCMWA, and DCWPCL each provide for liquidated damages in addition to the recovery of unpaid wages.  *See* 29 U.S.C. § 216(b) (permitting recovery of "an additional equal amount as liquidated damages"); D.C. Code § 32-1012(b)(1) (permitting recovery of liquidated damages equal to treble the unpaid wages); D.C. Code § 32-1303(4) (requiring liquidated damages equal to the lesser of treble the unpaid wages or ten percent of the unpaid wages for each working day following employee's separation under DCWPCL).  The FLSA and DCMWA both shield employers that acted in good faith and had reasonable grounds for believing that their act or omission was not a violation of the law.  29 U.S.C. § 260; D.C. Code §32-1012(b)(2)(a)–(b).  But, the DCMWA imposes an additional requirement—"[t]hat the employer [seeking a good faith exemption] promptly paid the full amount of wages claimed to be

15

owed to the employee." D.C. Code §32-1012(b)(2)(c); *see Seo v. Oh*, No. 18-cv-785, 2023 WL 143910, at *3 (D.D.C. Jan. 10, 2023) (denying exception where defendants had not paid claimed overtime wages).

Because D.C. law "provides for greater liquidated damages than the FLSA, [and] 'is more generous to employees on the relevant points, the Court will first assess damages under D.C. law and will not award a duplicative amount pursuant to federal law.'" *Martinez v. Asian 328, LLC*, 220 F. Supp. 3d 117, 122 (D.D.C. 2016) (quoting *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 104 (D.D.C. 2015)); *see* 29 C.F.R. § 778.5 (stating that the FLSA does not override state and local wage-and-hour laws that "do[] not contravene the requirements" of the FLSA). It is undisputed that Mr. Sanchez has not been paid for the full amount of wages owed, thus Defendants cannot be exempt from the DCMWA. Moreover, an employer that is exempt from liquidated damages under the DCMWA may be nonetheless liable for liquidated damages under the DCWPCL if the claimed wages were not paid within the statutory window. D.C. Code §32-1303(1)–(2) (requiring payment of all earned wages within four days of employee discharge or 7 days of employee resignation); *see Covington v. FMC & Assocs., LLC*, No. 1:22-cv-01441, 2023 WL 5133184, *6 (D.D.C. Aug. 10, 2023) (holding that between the DCMWA and DCWPCL, "[t]here is no indication that either civil cause of action precludes the other." (quoting *Gwapadinga v. Fescum Inc.*, 636 F. Supp. 3d 71, 73 (D.D.C. 2022))); *see* D.C. Code § 32-1012(a) ("A civil action may be commenced according to, and with all the remedies provided under, § 32-1308[, the DCWPCL]."). Mr. Sanchez is therefore entitled to treble the liquidated damages owed—$336,307.50—pursuant to the DCMWA and DCWPCL.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court concludes that Defendants violated the Federal Fair Labor Standards Act, the D.C. Minimum Wage Act Revision Act, and the D.C. Wage Payment and Collection Law by failing to pay Plaintiff his overtime wages. Defendants are thus ordered to pay Plaintiff $112,102.50 in damages for unpaid overtime wages and $336,307.50 in liquidated damages. Final judgment will be entered for Plaintiff. A reward of attorney's fees and costs to the prevailing party is mandatory under the FLSA and the DCMWA. 29 U.S.C. § 216(b); D.C. Code §§ 32-1012(c), 32-1308(b). The Court instructs Plaintiff to promptly file a fee petition to determine the amount for attorney's fees.

Date: <u>August 2, 2024</u>

                                                                                       ROBIN M. MERIWEATHER
                                                                                       UNITED STATES MAGISTRATE JUDGE